## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| SCOTT T. MORRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 3:12-CV-538-TLS |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

The Plaintiff, Scott T. Morris, seeks review of the final decision of the Commissioner of

the Social Security Administration ("Commissioner") denying his application for Social Security

Disability and Supplemental Security Income disability benefits pursuant to 42 U.S.C. § 405(g)

and § 1383(c)(3). The Plaintiff argues that the Commissioner's decision is not based on

substantial evidence and that the Commissioner erred as a matter of law in the denial of Social

Security Disability benefits.

## PROCEDURAL HISTORY

The Plaintiff applied for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") on October 11, 2010, alleging an onset date of October 8, 2010, due to a

back injury, deteriorating vision, depression, and posttraumatic stress disorder ("PTSD"). The

Plaintiff's applications were denied both initially and upon reconsideration. The Plaintiff then

requested a hearing in front of an administrative law judge, which was held on November 16,

2011. The Plaintiff was represented by counsel and had a vocational expert testify at the hearing.

On January 18, 2012, the Administrative Law Judge ("ALJ"), Bryan J. Bernstein, found that the

Plaintiff was limited to a range of medium work and was not disabled because he could perform a significant number of jobs in the national economy. The Plaintiff filed a request for review with the Appeals Council of the Office of Disability Adjudication and Review on March 19, 2012. The Appeals Council denied the Plaintiff's request for review on August 8, 2012, making the ALJ's decision the final decision of the Commissioner.

On September 21, 2012, the Plaintiff filed a Complaint [ECF No. 1] in this Court seeking review of the Commissioner's decision.

## EVIDENCE OF RECORD

The Plaintiff claims to be disabled based on deteriorating vision, back and neck pain, and psychological limitations from PTSD. The Plaintiff's opening brief focuses significant attention on the issue of vision loss. Therefore, the Court considers the factual background on vision loss separately from the other issues raised by the Plaintiff, which involve exertional capacity and mental health.

**A.      Vision Loss**

Although the Plaintiff has had longstanding blindness in his right eye, he stopped working in his job driving a truck when he began experiencing impaired vision in his left eye. On October 13, 2010, Dr. Jon Mark, the Plaintiff's Optometrist, wrote a letter stating that the Plaintiff suffered from "longstanding blindness in the right eye and recent visual impairment in the left eye of a nature yet to be determined." (Tr. 306.) On October 19, 2010, Dr. Mark evaluated the Plaintiff and observed uncorrected visual acuity of hand motion at six inches in the right eye and 20/50 in the left eye. Specifically, in a note written November 8, 2010, Dr. Mark

wrote that in the left eye "visual acuity was 20/50 and visual field was reduced to less than 20 degrees central, cause has not been determined . . . . He is currently legally blind in both eyes and should limit his activities accordingly." (Tr. 297.)

On December 27, 2010, the Plaintiff met with Dr. Earl Braunlin for a consultative ophthalmology examination. Dr. Braunlin observed visual acuity of 20/70 in the left eye. (Tr. 348.) Under "best corrected visual acuity (Snellen)," Dr. Braunlin noted 20/50 for the left eye in the place marked "Distant." (Tr. 349.) Right next to where Dr. Braunlin recorded the 20/50 observation he wrote "I doubt if the recorded vision is reliable here." (*Id.*) Again at the end of the report, Dr. Braunlin wrote, "I do not feel his vision as recorded was reliable." (Tr. 350.) Finally, at the end of the report Dr. Braunlin wrote, "I believe the vision in his left eye is better than the recorded vision of 20/50. I believe his real vision with the left eye may be closer to a normal 20/20 vision." [1] (*Id.*)

On March 16, 2011, the Plaintiff met with Dr. Valerie Purvin for a consultative neuro-ophthalmologic examination. Dr. Purvin recorded an uncorrected visual acuity in the left eye of 20/60 and a corrected visual acuity of 20/25. (Tr. 370.) The Plaintiff points out in his brief that Dr. Purvin stated that his visual fields were "markedly constricted and tubular (non-organic)." (*Id.*) Dr. Purvin also stated that "[w]hen the visual field was tested without the patient's understanding of the test (specifically, finger-nose maneuver) his field was full." (*Id.*) Dr. Purvin concluded by stating that the Plaintiff "appears to have visual loss in the left eye as well but on closer inspection this turns out to be non-organic. There is no objective evidence of any organic disease affecting the vision in his left eye." (*Id.*)

---

[1] Notably, the Plaintiff mentioned Dr. Braunlin's observation of 20/50 vision in the left eye, but failed to make any mention in his brief of Dr. Braunlin's multiple statements in the same document that he believes this recorded observation to be unreliable.

**B.** **Exertional Capacity and Mental Health**

Other than issues related to vision loss, the Plaintiff challenges the ALJ's Residual Functional Capacity findings with regard to exertional capacity and mental issues. Due to the nature of the legal arguments at issue, an extensive factual background is not required. The ALJ's opinion provides more significant detail regarding the medical records in this case. (Tr. 29–36.) The Court addresses only the factual background necessary for this decision. The Plaintiff's brief and the ALJ's opinion provide additional factual details.

The Plaintiff has complained of back pain, neck pain, and PTSD. The Plaintiff developed symptoms consistent with PTSD after his return home from contracting work in Iraq in October 2009, as observed by Dr. Russell G. Coulter-Kern, Ph.D. (Exhibit 3F, p.1). His condition improved with medication management as reported by Dr. Tina Lawson. (Tr. 319 & 353.) The Plaintiff was referred to, and met with, Dr. Hani Ahmad, a psychiatrist, on October 19, 2011. Dr. Ahmad diagnosed the Plaintiff with PTSD and noted that he had "poor coping skills." (Tr. 473–77.) Dr. Ahmad assessed the Plaintiff with a Global Assessment of Functioning ("GAF") score ranging from 50 to 70. (Tr. 31, 477.) A GAF score of 61–70 reflects "some mild symptoms" or "some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well." (Def. Br. 11 (quoting American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*)). After reviewing Dr. Ahmad's findings, the ALJ determined that the higher end of the score range, 70, was most reflective of the Plaintiff's functioning and symptoms. (Tr. 31.)

The ALJ's opinion and the Plaintiff's brief provide extensive details related to exertional capacity. An extensive summary of the facts is unnecessary for the purposes of this opinion. The Plaintiff has focused the vast majority of his legal arguments on the issue of vision loss. At the

4

same time, the few legal arguments made with respect to exertional capacity do not require additional factual background, as will be made clear below.

**ANALYSIS**

An ALJ conducts a five-step inquiry in deciding whether to grant or deny benefits as required by 20 C.F.R. § 404.1520. The Plaintiff has not engaged in substantial gainful employment since the claimed onset date of October 8, 2010, which satisfied the step one inquiry. At step two, the ALJ determined that the Plaintiff had an impairment, or impairments, that should be considered severe. Step three requires the ALJ to "consider the medical severity of [the] impairment" to determine whether the impairment "meets or equals one of [the] listings in" appendix 1.20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment rises to this level, he earns a presumption of disability "without considering [his] age, education, and work experience." *Id.* at § 404.1520(d). But if the impairment falls short, an ALJ must move on to step four and examine the claimant's "residual functional capacity"—the types of things he can still do physically despite his limitations—to determine whether he can perform "past relevant work," *id.* at § 404.1520(a)(4)(iv), or, failing that, whether the claimant can "make an adjustment to other work" given his "age, education, and work experience," *id.* at § 404.1520(a)(4)(v), which constitutes step five of the analysis. In this case the ALJ determined that the Plaintiff's impairment did not meet or equal any of the listings in appendix 1. At step four, the ALJ found that the Plaintiff's impairments pose more than minimal restrictions on his capacity for work and that he does not have the capacity to perform past relevant work. At step five, however, the ALJ determined that the Plaintiff is able to make an adjustment, based on his "age, education, and

work experience," to perform medium work as defined in 20 C.F.R. § 404.1567(c) and

§ 416.967(c), "except that he has monocular vision with depth perception deficits." (Tr. 29.)

The Plaintiff alleges that the Commissioner's step three, presumptive disability analysis is not supported by substantial evidence. More specifically, the Plaintiff argues that the Commissioner committed legal error by determining that the uncertainty as to the cause of the Plaintiff's vision loss precluded a finding of statutory blindness under Title XVI. Finally, the Plaintiff argues that the Commissioner ignored highly probative evidence regarding the probably psychogenic cause of the visual field loss in the Plaintiff's left eye and that the visual loss satisfied the criteria in the Listings, the Social Security regulations, and the Social Security Act itself.

The Plaintiff also challenges the Commissioner's Residual Functional Capacity analysis claiming that the conclusions are not supported by substantial evidence. Specifically, the Plaintiff argues that the Commissioner ignored objective medical evidence regarding all the Plaintiff's limitations, failed to translate medical opinion into a vocational limitation, which caused the vocational expert's testimony to be unreliable, and failed to cite a specific job the claimant could perform.

In an appeal from the denial of social security benefits, the court is not free to replace the ALJ's estimate of the medical evidence with its own. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (stating that the court may not reweigh the evidence or substitute its judgment for that of the ALJ). Instead, the court reviews the ALJ's decision for substantial evidence, 42 U.S.C. § 405(g), meaning that the court ensures that the decision rests on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When an ALJ recommends that the agency deny benefits, it must first

"build an accurate and logical bridge from the evidence to the conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "In other words, as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008). Conclusions of law are not entitled to such deference, however, so where the ALJ commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

### A.      Presumptive Disability Analysis on Visual Loss

The Plaintiff challenges the ALJ's presumptive disability analysis on four grounds. First, he claims the ALJ committed legal error regarding the requirements for statutory blindness under Title XVI. Second, he claims the ALJ erred by ignoring evidence that there was a legitimate cause of his vision loss under Title II. Third, he argues the ALJ ignored probative evidence of statutory blindness. And fourth, the Plaintiff argues that the ALJ erred by failing to properly analyze whether his impairments medically equaled Listings 2.03B, 2.03C, and 2.04. The Court considers each in turn.

### 1.      *Cause under Title XVI*

The Plaintiff alleges that the ALJ committed a legal error by stating that the claimant is "required to establish the cause of his blindness" to satisfy the requirements of Title XVI statutory blindness. (Tr. 28.) The Plaintiff, in his brief, states that the "ALJ apparently considered

this [cause of blindness] to be significant" by making the statement that Title XVI required a cause. (Pl.'s Br. 14.) The Court finds that the Plaintiff makes too much out of a minor mistake by the ALJ. When setting out the standards for statutory blindness, the ALJ stated that "Listing 2.00A(3) provides guidance under Title 16, the claimant is required to establish the cause of his blindness. In addition, Listing 2.00A(4) provides guidance for evaluating statutory blindness for Title II claims." (Tr. 28.) A review of the Appendix 1 Listings reveals that it is Listing 2.00A(4) regarding statutory blindness under Title II that requires the claimant to establish the cause of his blindness. 20 C.F.R. § 404app. 1. Listing 2.00A(3), regarding statutory blindness under Title XVI, states that "[w]e do not need documentation of the cause of your blindness." *Id.*

Thus, the ALJ was incorrect by stating that the cause requirement applied to Title XVI when it actually only applies to Title II. While this is true, it is quite another thing to accept the Plaintiff's vague argument that because of this mistake, the "ALJ apparently considered this to be significant." The ALJ's opinion actually reveals that his statutory blindness determination was not based on the fact that the Plaintiff did not establish the cause of blindness, but rather, the ALJ specifically stated that

> [i]n this particular case, his visual disorder fails to meet the statutory definition of blindness because the [*sic*] he lacks the requisite loss of visual acuity, contraction of peripheral visual fields, or loss of visual efficiency in the better eye.

(Tr. 29.)

"The doctrine of harmless error indeed is applicable to judicial review of administrative decisions." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). The Court will not remand a case to the ALJ when it is convinced the ALJ would reach the same result. *Id.* The Court is mindful that the Seventh Circuit has emphasized that the harmless error standard should be construed narrowly. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). In this instance, however, the Plaintiff is focusing on a misstatement of a standard that did not impact the ALJ's conclusion on

8

this particular issue. The Court is convinced that a remand on the issue of statutory blindness under Title XVI to correct the ALJ's misstatement of the "cause of blindness" requirement would not lead to a different result. Therefore, the ALJ's misstatement, whether due to typographical error or something else, constitutes harmless error.

**2.      *Cause under Title II***

As expressed above, a claimant is required to demonstrate a cause of blindness to satisfy the requirements for statutory blindness under Title II. The Plaintiff cites *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000), for the proposition that an ALJ must discuss the evidence that contradicts the Commissioner's position, and argues that the ALJ ignored evidence regarding the cause of the Plaintiff's blindness. Specifically, the Plaintiff offered three examples of evidence the ALJ allegedly ignored. First, the Plaintiff points to Dr. Mark's notes from an October, 2010, examination stating that the Plaintiff's left eye was "classic for hysterical loss which may be traumatic stress induced." (Tr. 300.) The Plaintiff alleges that this evidence contradicts the Commissioner's position and that the ALJ ignored it. This argument is flawed, however, because the Plaintiff wrongfully concludes that this one sentence from Dr. Mark's notes contradicts the Commissioner's position that there was no identifiable cause for the Plaintiff's vision loss. Dr. Mark's statement that the Plaintiff's condition is "classic for hysterical loss" and "may be traumatic stress induced" does not identify a cause of the vision loss. This statement only provides speculation regarding possibilities—hence the use of the word "may." This statement does not constitute a diagnosis and in the same report, which the ALJ did cite in his opinion, Dr. Mark refers the Plaintiff to Dr. Purvin for further examination. (Tr. 300.) Additionally, in the same report the Plaintiff cites, Dr. Mark stated that "[e]tiology is yet to be determined." (Tr.

297.) Dr. Mark's report did not contradict the Commissioner's position as he did not actually identify a cause. Therefore, the Plaintiff's argument fails on this point.

The Plaintiff also claims that Dr. Mark expressed concern that the claimant had PTSD and that Dr. Purvin diagnosed the Plaintiff with nonorganic visual field loss and stated that his visual field was "tubular." The Plaintiff apparently believes that these two pieces of evidence were ignored by the ALJ and that both pieces of evidence contradict the Commissioner's position regarding the cause of left eye vision loss. This argument also fails. The Plaintiff cites a document that explains the meaning of "non-organic visual loss," but the document the Plaintiff cites states that such loss may be psychogenic "or the result of malingering."[2] A malingerer is someone who feigns visual loss and "non-organic visual loss" is a term used when there is no identifiable physical cause. Dr. Purvin's report merely states that the Plaintiff's visual loss is non-organic—she did not identify a specific cause. (Tr. 370.) Thus, the information cited by the Plaintiff does nothing to contradict the Commissioner's position and thus *Godbey* does not apply. Furthermore, Dr. Mark's statement regarding his concern that the Plaintiff had PTSD makes no connection between the Plaintiff's vision and PTSD. Therefore, this piece of evidence is irrelevant to the analysis related to cause.

Ultimately, the Plaintiff had the duty to present evidence that contradicted the Commissioner's position and failed to do so. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (finding that it was unnecessary for the ALJ to articulate reasons for accepting a doctor's determination when there was no contrary evidence presented). Thus, the Court rejects the Plaintiff's argument that the ALJ ignored evidence contrary to the Commissioner's position regarding a lack of cause for vision loss under Title II.

---

[2] S. Beatty, *Non-organic Visual Loss*, 75 Postgrad Medical Journal 201, 201–07 (1999), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1741186/pdf/v075p00201.pdf.

*3.*      ***Probative Evidence of Statutory Blindness***

Next, the Plaintiff argues that the ALJ ignored probative evidence showing that the Plaintiff actually met the definition of statutory blindness. The statute defines blindness as follows:

> blindness means central visual acuity of 20/200 or less in the better eye with the use of a correcting lens. An eye which is accompanied by a limitation in the fields of vision such that the widest diameter of the visual field subtends an angle no greater than 30 degrees shall be considered for purposes of this paragraph as having a central visual acuity of 20/200 or less.

42 U.S.C. § 416(i)(1). The ALJ committed multiple errors that require this Court to remand the case. First, the ALJ stated that "[t]he Act defines blindness as visual acuity of 20/200 or less in the better eye with the use of a correcting lens. In order to meet the guidelines of statutory blindness, the claimant's visual disorder would need to meet the criteria of 2.02 or 2.03A." (Tr. 28.) While the ALJ did mention Listing 2.03A, he failed to articulate that the Act also states that "[a]n eye which is accompanied by a limitation in the fields of vision such that the widest diameter of the visual field subtends an angle no greater than 20 degrees shall be considered for purposes of this paragraph as having a central visual acuity of 20/200 or less." 42 U.S.C. § 416(i)(1). This omission coupled with the ALJ's analysis, discussed below, leaves the Court unable to determine whether the ALJ properly evaluated the second part of the definition of statutory blindness and the potentially relevant evidence on that topic.

Dr. Mark performed an eye exam that included an "OS Threshold 24-2 exam." (Tr. 299.) This would seem to meet the requirements of Listing 2.00A6c, which states that a "Humphrey 30-2 or 24-2 test" is acceptable for determining whether a complainant meets Listing 2.03A. 20 C.F.R. § 404 app. 1. Dr. Mark found that the Plaintiff's visual field was reduced to less than 20

degrees central (Tr. 297.) In another eye exam, Dr. Braunlin tested the Plaintiff's visual field as less than 20 degrees in one measurement and less than 10 degrees on a second measurement. (Tr. 351.) He also stated that he did not think the results were reliable, that future testing should be done, and that he thought the Plaintiff's vision was closer to normal than the measurements indicated. (Tr. 351.)

The ALJ examined the medical evidence with regard to the Plaintiff's visual acuity testing, but he failed to address the field of vision measurements in the record. These two types of testing are different and statutory blindness may be shown using one or the other. Dr. Mark and Dr. Braunlin both did visual field measurements. The record does not indicate that Dr. Purvin conducted such tests, as she apparently only tested the Plaintiff using the confrontation method and the "finger-nose maneuver." (Tr. 370.) She stated that when the Plaintiff did not know she was testing him, his field was full. Perhaps the ALJ considered the issue of visual field testing and had reasons for finding it insufficient to show statutory blindness. The Court, however, cannot speculate as to a potential rationale that the ALJ did not offer. Instead, the ALJ ignored this entire line of evidence that appears, at least on its face, to be contrary to his conclusion on statutory blindness. *Arnett v. Astrue*, 676 F.3d 586, 592-93 (7th Cir. 2012) (noting that an ALJ may not ignore entire lines of contrary evidence). Therefore, the Court remands this case to the ALJ for reconsideration of all the medical evidence related to visual loss in the Plaintiff's left eye. Specifically, the ALJ must consider not only visual acuity measurements, but also any evidence regarding visual field loss measurements in accordance with the acceptable tests described in Listing 2.00A6.

## 4.     Equivalency

The Plaintiff argues that the ALJ erred by failing to "adequately articulate whether the claimant's visual disorder medically equaled Listing 2.03C or 2.04." (Pl.'s Br. 18.) Listing 2.03C reads as follows: "Contraction of the visual field in the better eye, with . . . [] A visual field efficiency of 20 percent or less, determined by kinetic perimetry (see 2.00A7c)." 20 C.F.R. § 404 app. 1. Listing 2.04 reads "[l]oss of visual efficiency, or visual impairment, in the better eye: [] A visual efficiency percentage of 20 or less after best correction (see 2.00A7d) OR [] A visual impairment value of 1.00 or greater after best correction (see 2.00A8d)." 20 C.F.R. § 404app. 1. The Plaintiff states that the ALJ "concluded, without explanation, that his impairments did not medically equal Listing 2.03 or 2.04." (Pl.'s Br. 18.) However, the only piece of evidence the Plaintiff identifies is the fact that there is evidence that the "claimant's visual field in the left eye was markedly restricted, resulting in 'tunnel vision.'" (*Id.*)

The Plaintiff has the burden of presenting medical evidence to show that an impairment or combination of impairments equals one of the listed impairments. *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) ("For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment."). Specifically, the Plaintiff must present findings that his impairment or impairments is "medically equivalent" to a listing. 20 C.F.R. § 416.926(b). The cited listings, 2.03C and 2.04, include internal references that explain the very technical way in which a claimant is evaluated to determine whether he meets the listing. To prove that such a listing is met, the Plaintiff must present medical evidence to support a finding that his impairment equals a listing. The ALJ acknowledged that various doctors' examinations showed that the Plaintiff had some vision

problem in his left eye. (Tr. 28–29.) Nevertheless, the Plaintiff has not pointed to any medical evidence he presented showing that his impairment equaled Listing 2.03C or Listing 2.04. The Seventh Circuit has indicated that remand is not appropriate when a claimant fails to identify evidence ignored by the ALJ showing that he may have met or equaled a listing. *Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002) (noting that the Plaintiff must present medical evidence supporting his claim and that the evidence allegedly ignored by the ALJ did not show that the impairments met or equaled a listing). Therefore, the Plaintiff's request for remand on the issue of equivalency is denied.

**B.      Weighing of Opinion Evidence**

The Plaintiff argues that the ALJ improperly discounted Dr. Mark's medical opinion. Notably, the Court may not reweigh evidence. *Terry*, 580 F.3d at 475. The Plaintiff correctly points out that an ALJ may not only discuss the parts of a physician report that support the ultimate conclusion while ignoring evidence pointing in the other direction. *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010). However, it is also the case that an ALJ is not required to provide a written evaluation of every single piece of evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (citing *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985)).

The Plaintiff's argument regarding the weight given to Dr. Mark's report overlaps with some of the Plaintiff's other arguments including those discussed in Sections A.3, C.1, and C.3 of this Opinion. As discussed in Section A.3 of this Opinion, the Court is remanding this case so that the ALJ can fully consider Dr. Mark's report regarding visual field loss measurements. Thus, upon reconsideration the ALJ can determine whether he wishes to adjust the weight given to Dr. Mark's opinion. The Plaintiff argues that the ALJ failed to address certain factors that an

ALJ must address when deciding not to give a doctor's opinion controlling weight. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) ("If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion."). The ALJ touched on some of these factors implicitly but failed to clearly explain his decision under these factors. This Court is already remanding the case for reconsideration of a portion of Dr. Mark's opinion. Thus, the Court also remands on the issue of the weight given to Dr. Mark's opinion. Specifically, after considering the additional information as set forth in Section 3.A. of this Opinion, the ALJ should clearly and concisely address the factors set forth in *Moss* when explaining the weight, or lack thereof, given to Dr. Mark's opinion.

## C.      Residual Functional Capacity

The Plaintiff alleges that the ALJ's Residual Functional Capacity ("RFC") assessment is not supported by substantial evidence. The ALJ's job was to assess the Plaintiff's RFC by evaluating the "objective medical evidence and other evidence" to determine whether it was consistent with the Plaintiff's subjective statements regarding his impairment. 20 C.F.R. § 404.1529(a), (d)(3). In general, the claimant is responsible for providing the evidence that the ALJ uses to determine the RFC. 20 C.F.R. § 404.1545(a)(3). Evidence offered must be "complete and detailed enough to allow" the ALJ to make a determination of disability, including the RFC to do work-related physical activities. 20 C.F.R. §404.1513(e). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.

1994). But an ALJ must only "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).

### 1. Vision Loss

The Plaintiff argues that the ALJ failed to confront Dr. Mark's conclusion that the Plaintiff was legally blind in both eyes and that he would have difficulty recognizing ordinary work place hazards due to visual loss. (Pl.'s Br. 22.) However, the ALJ actually acknowledged Dr. Mark's opinion that the Plaintiff "will have trouble with any task requiring normal sight." (Tr. 35.) But, the ALJ also stated that he gave Dr. Mark's opinion "little weight" because it was not clear that the doctor was "familiar with the definition of vocational demands and requirements of jobs involving 'normal vision.'" (*Id.*) Furthermore, the ALJ stated that he thought it possible that the doctor was actually referring to the Plaintiff's inability to perform past work. (*Id.*) Regardless, the ALJ's opinion demonstrates that he considered Dr. Mark's opinion, decided to give it "little weight," and explained why he made that decision. (*Id.*) The Plaintiff has picked out specific pieces of Dr. Mark's reports and complains that the ALJ did not cite those precise pieces directly. The ALJ is not required to provide written evaluation of every single piece of evidence. *Herron*, 19 F.3d at 333 (citing *Orlando*, 776 F.2d at 213). The ALJ properly confronted and addressed Dr. Mark's opinions in the process of making his determinations. Therefore, the Plaintiff's argument fails.

### 2. Exertional Capacity

Next, the Plaintiff argues that the ALJ ignored evidence contrary to his conclusion that the Plaintiff was capable of performing medium work. Specifically, the Plaintiff alleges that the

ALJ misrepresented an MRI of the Plaintiff's cervical spine, ignored the Plaintiff's complaints about pain, ignored a specific observation by Dr. Mango regarding "give way" weakness, and ignored that the Plaintiff was instructed following surgery to avoid lifting or twisting activities and was given a weight restriction of ten pounds. (Pl.'s Br. 23.) The Plaintiff set forth in his brief the general standard that an ALJ may not ignore entire lines of evidence and must confront evidence that does not support his conclusion. *Arnett*, 676 F.3d at 592–93; *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2002). But it is also the case that the ALJ need only "minimally articulate" the justification for his conclusions. *Rice*, 384 F.3d at 371. Additionally "[a] skeletal 'argument', really nothing more than an assertion, does not preserve a claim." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (citing *United States v. Giovannetti*, 919 F.2d 1223, 1230 (7th Cir.1990)). "Especially not when the brief presents a passel of other arguments, as [the Plaintiff's] did." *Id.*

Despite citing a few very specific pieces of information pulled from the record, the Plaintiff has failed to make a complete argument. He simply mentions several pieces of evidence and states that the ALJ ignored them. This is a conclusory and skeletal argument. To succeed in obtaining a remand, the Plaintiff needed to show that the ALJ failed to confront evidence that is contrary to his conclusion. The ALJ analyzed the record and provided a summary of relevant evidence (Tr. 33–34.) The Plaintiff has simply pulled out specific statements from various reports in the record and complained that the ALJ did not mention them. Yet the Plaintiff provides no explanation as to why a discussion of these specific pieces of evidence was necessary or would have merited a different outcome. An ALJ is not expected to address every single line of every single report via a written evaluation. *Herron*, 19 F.3d at 333. The Plaintiff

has failed to provide a sufficient argument, and the Court finds that remand on this issue is unnecessary.

### 3.    *Mental RFC*

The Plaintiff argues that the ALJ failed to "incorporate the claimant's psychiatric impairments into his RFC findings." (Pl.'s Br. 24.) The Plaintiff's argument in this section of his brief points to a couple specific pieces of evidence and states that the ALJ either "never discussed" or "never mentioned" a certain piece of evidence. (Pl.'s Br. 24–25.) The Plaintiff fails, however, to explain why the ALJ's choice not to mention these specific pieces of evidence was prejudicial or otherwise would have changed the outcome of the analysis. An ALJ is not required to provide a written evaluation of every piece of testimony or evidence. *Herron*, 19 F.3d at 333 (citing *Heckler*, 776 F.2d at 213). The ALJ thoroughly analyzed the psychiatric issues impacting the Plaintiff and appears to have fully considered the related evidence including the various medical reports in the record. (Tr. 29–36.)

More specifically, the Plaintiff argues that the ALJ ignored and never mentioned the opinion of Dr. Kenneth Neville, who completed an RFC assessment. (Pl.'s Br. 25.) The ALJ, however, stated that Dr. Neville's opinion was given "little weight because additional evidence was submitted at the hearing level that the state agency medical consultants did not have an opportunity to review." (Tr. 35.) The Plaintiff also argues that the ALJ's findings differ "dramatically" from Dr. Ahmad's observations. But the Plaintiff's characterization of Dr. Ahmad's findings is less than complete. A simple review of the ALJ's opinion shows that he thoroughly considered Dr. Ahmad's findings prior to making his RFC determination. (Tr. 31.)

The ALJ's RFC analysis on mental issues was supported by substantial evidence and remand is not merited.

**D.     Satisfying the Step Five Burden**

The Plaintiff offers a variety of arguments regarding errors in the ALJ's step five analysis.  First, the Plaintiff argues that the ALJ failed to "fully set forth the claimant's limitations relating to his visual loss, neck and back pain, and psychological impairments." (Pl.'s Br. 26.) Essentially, though, this is a rehash of his arguments regarding the ALJ's RFC findings. The Court has already considered these challenges above. The Plaintiff does offer two new arguments: (1) The ALJ erred by including a medical opinion in his hypothetical question without translating that opinion into a relevant vocational limitation; and (2) The ALJ failed to provide specific examples of jobs the claimant can perform as required by SSR 83–14.

*1.     The ALJ's Inclusion of a Medical Opinion*

The Plaintiff argues that the ALJ included a medical opinion in his hypothetical question to the Vocational Expert ("VE") without having a medical source translate that opinion into a vocational limitation. Specifically, the Plaintiff stated in his brief that "[w]hen a medical source of record translates his findings into a particular RFC assessment, the ALJ may reasonably rely on that opinion in formulating a hypothetical question for the VE." (Pl.'s Br. 26 (citing *Lichtsinn v. Astrue*, 683 F. Supp. 2d 811, 822 (N.D. Ind. 2010)). The Plaintiff argues that the ALJ's determination that he could perform medium work "except that he has monocular vision" was not in line with Dr. Mark's RFC analysis (Tr. 466–69) and thus the ALJ must have relied on Dr. Purvin or Dr. Braunlin, both of whom did not translate their opinions into RFC assessments.

Dr. Mark, however, was not the only doctor to complete an RFC assessment. The ALJ wrote that "[g]reat weight is accorded to the State agency's medical consultant's physical assessments as it is supported by medically acceptable clinical findings and consistent with the record (Exhibits 11F and 13F)." (Tr. 35.) The citation to Exhibit 13F is a citation to the physical RFC assessment of Dr. Fife. Dr. Fife found that the Plaintiff has "abnormal vision OS but not reproducible and considered to be non-organic. Monocular vision only." (Tr. 383–90.) Dr. Fife also opined that the Plaintiff must "avoid situations requiring depth perception." (*Id.*) Finally, Dr. Fife produced additional RFC findings that are completely consistent with the ALJ's finding that the Plaintiff could complete medium work except that he had monocular vision. (*Id.*)

The ALJ's hypothetical to the VE is consistent with a medical opinion translated into an RFC assessment by a medical source. Thus, the ALJ was able to rely on Dr. Fife's opinion when crafting his hypothetical question. The Plaintiff's argument on this point fails.

## 2.    *The ALJ Failed to Comply with SSR 83–14*

The Plaintiff also argues that this case should be remanded because the ALJ failed to cite examples of specific jobs that he can functionally and vocationally perform. SSR 83-14 requires that

> [w]henever vocational resources are used [as in this case], and an individual is found to be not disabled, [ALJ's] decision *will include* (1) citations of examples of occupations/jobs the person can do functionally and vocationally and (2) a statement of incidence of such work in the region in which the individual resides or in several regions of the country.

SSR 83-14, 1983 WL 31254 (emphasis added). Here, the ALJ characterized the VE's testimony as follows:

> the residual capacity assessed is consistent with nearly a full range of medium work and the additional limitations that would only reduce the occupational base of work at the

medium exertional level by 20%. The vocational expert testified there are at least 120,000 unskilled jobs at the medium exertional level in Indiana that would accommodate a claimant with monocular vision.

(Tr. 37.) The Commissioner argues that the ALJ's failure to list specific jobs constitutes harmless error. (Def. Br. 13.) This argument, however, ignores the specific language of SSR 83-14, which this Court has previously applied. *Mitchell v. Barnhart*, 1:03-cv-12, 2003 U.S. Dist. LEXIS 26766, 20–24 (N.D. Ind. August 29, 2003); *Lovellette v. Barnhart*, 1:02-CV-278, 2003 WL 21918642 (N.D. Ind. June 25, 2003). The ALJ's failure to identify any jobs or occupations at all was legal error, requiring remand. *See Prince v. Sullivan*, 933 F.2d 598, 603 (7th Cir. 1991) ("Although this court reviews the ALJ's determination for substantial evidence, we are not in a position to draw factual conclusions on behalf of the ALJ. . . . Until the Social Security Administration revokes . . . [SSR 83-14] we will hold the ALJs to the requirements set out in that ruling by the Secretary [Commissioner]"). Therefore, the Court finds that remand is necessary for further findings by the ALJ in accordance with SSR 83-14.

**CONCLUSION**

For the reasons stated above, the Court REMANDS this case for further proceedings in accordance with this opinion. Specifically, the ALJ is to reconsider the following: (1) Probative evidence of statutory blindness—specifically visual field loss measurements; (2) The weight given to Dr. Mark's medical opinion; (3) Compliance with SSR 83–14 at Step Five of the analysis; and (4) Any and all additional considerations—particularly those impacted by any changes to the analysis following reconsideration of the issues described above.

SO ORDERED on March 26, 2014.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION